## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**THE DIAL CORPORATION,**

      **Plaintiff,**

**v.**

**NEWS CORPORATION,**
**NEWS AMERICA INC.,**
**NEWS AMERICA MARKETING FSI LLC,**
**NEWS AMERICA MARKETING IN-STORE**
**SERVICES, LLC,**

      **Defendants.**

**Civil Action No.** _____

**COMPLAINT**

**District Judge**

**Magistrate Judge**

**Jury Demand**

---

R. Stephen Berry
Berry Law PLLC
1717 Pennsylvania Avenue, NW
Suite 450
Washington, DC 20006
(202) 296-3020
EMAIL: sberry@berrylawpllc.com
D.C. Bar No. 234815

Justin M. Presant
Kellogg, Huber, Hansen, Todd, Evans,
  & Figel, PLLC
1615 M Street, NW - Suite 400
Washington, DC 20036
(202) 326-7900
EMAIL: jpresant@khhte.com
Mich. Bar No. P74252

*Counsel to The Dial Corporation*

## Table of Contents

**Page**

I.    **NATURE OF THE ACTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      A.    Monopolization of the Relevant Market for In-Store Promotion Services . . . . . . 2

            1.    Exclusive Contracts Denying Competitors Access to Distribution Through Retail Chains . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

            2.    Exclusive Contracts Also Deny Competitors Access to Purchasers . . . . . 4

      B.    News' Monopolization of the Sale of FSI Coupons . . . . . . . . . . . . . . . . . . . . . . 4

            1.    Long-term, Exclusive Contracts Denying Competitors Access to Purchasers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

            2.    Unlawful Tying or Bundling of FSI Coupons . . . . . . . . . . . . . . . . . . . . . . 5

      C.    Injury to Competition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.    **PARTIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III.    **JURISDICTION AND VENUE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

IV.    **RELEVANT MARKETS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      A.    Relevant Product Market for Third-Party In-Store Promotion Services . . . . . . . 8

      B.    Relevant Geographic Market for the Sale of In-Store Promotion Services . . . . . . 9

      C.    News' Market Power in the In-Store Relevant Market . . . . . . . . . . . . . . . . . . . . 9

      D.    Relevant Product Market for Free-Standing Insert Coupons Placed in Newspapers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      E.    Relevant Geographic Market for the Sale of FSI Coupons . . . . . . . . . . . . . . . . 12

      F.    News' Market Power in the FSI Coupon Relevant Market . . . . . . . . . . . . . . . . 12

V.    **NEWS' MONOPOLIZATION OF THE IN-STORE RELEVANT MARKET** . . . 13

**Page**

A.   Long-Term, Exclusive Contracts Denying Competitors Access to Distribution .................................................... 13

B.   Practices Enhancing Competitor Exclusion from Distribution ............. 16

    1.   Hacking into Floorgraphics' Computerized Customer Lists and Marketing Materials ................................................ 16

    2.   Staggering the Terms of Exclusive Contracts ..................... 16

    3.   Aggressive Enforcement of Shelf Exclusivity .................... 17

    4.   Use of Cash Guarantees to Derail Competitor Contracts ........... 17

    5.   Disparaging Competitors' Compliance Rates ..................... 19

    6.   Defacing Competitor Advertisements and Disparaging Their Products ...................................................... 19

    7.   Disparaging Competitor Financial Viability ..................... 20

C.   Long-Term, Exclusive Contracts Also Denying Competitors Substantial Access to Consumer Packaged Goods Companies ...................... 20

VI.   **MONOPOLIZATION OF FSI COUPONS** ............................... 21

A.   Exclusive Contracts Denying Competitors Access to Purchasers ........... 21

B.   Unlawful Tying or Bundling of FSI Coupons ......................... 21

VII.   **INJURY TO COMPETITION** ......................................... 23

## COMPLAINT FOR DAMAGES AND
## INJUNCTIVE RELIEF AND JURY DEMAND

Pursuant to L.R.83.11(b)(7) this matter is a companion case to *Valassis Communications, Inc. v. News America Marketing, Inc.*, No. 06-10240 (E.D. Mich.) (Tarnow, J.). Plaintiff The Dial Corporation ("Dial") alleges as follows.

### I. NATURE OF THE ACTION

1.      In two distinct relevant markets the multifaceted and pervasive exclusionary strategies of Defendants ("News") over twenty years have violated the antitrust laws of the United States. News has suppressed competitive promotion of a massive number of consumer goods in forty thousand retail stores, and scores of newspapers nationwide, to acquire and maintain two unlawful monopolies and earn large monopoly profits at the expense of its purchasers.

2.      Its unlawful purposes could not be more transparent. For example, in a sales meeting Paul Carlucci, then News America Inc.'s Chief Operating Officer, illustrated News' desire for the ultimate in competitive suppression with a video from *The Untouchables,* in which Al Capone serves as a sales role model as he cudgels a competitive enemy to death with a baseball bat. Mr. Carlucci has been equally blunt with the press as to News' exclusionary purposes, vowing to "destroy" his competitors as a man "who has to have it all."

3.      Mr. Carlucci threatened to fire any News employee ("concerned about doing the right thing") who did not support exclusive control by News of shelves in retail accounts.

4.      His and his employer's goals have been achieved. They have severely injured competition in two relevant markets for the sale of in-store promotion services and free-standing-insert ("FSI") coupons in newspapers and have violated well-established antitrust law.

5.      Mr. Carlucci's unlawful achievements were rewarded by News with a promotion to Chairman and Chief Executive Officer of News America Marketing, Inc.

### A. Monopolization of the Relevant Market for In-Store Promotion Services

6.      The purchase of in-store promotion services allows consumer packaged goods companies such as Plaintiff Dial to promote their products to shoppers in retail chains of grocery stores, drugstores, mass retailers, home improvement stores and bargain stores throughout the United States. News acts as a middleman to place these services in the chains.

7.      News has unlawfully maintained a monopoly over the relevant market for these third-party services from approximately 2004 through the present.

8.      To do so, News has used, and continues to use, two sorts of long-term, exclusive contracts. The first sort forecloses access by its competitors to the retail chains they need to distribute their services.

9.      The second sort impedes its competitors' access to the consumer packaged goods companies, as they attempt to sell competitive services.

### 1. Exclusive Contracts Denying Competitors Access to Distribution Through Retail Chains

10.     Consumer packaged goods companies buy in-store promotion services for use in retail chains as a national sales tool. Often simultaneously, they seek to put their promotions in front of millions of consumers in more than forty thousand stores nationwide. Therefore News' competitors need to have substantial national retail distribution networks comparable in scope to that of News to be competitive. News has denied them this scope by employing long-term, exclusive contracts to lock them out of the chains.

-2-

11.     Over the last several years the contracts have prevented News' only two significant competitors, Floorgraphics Inc. (now defunct) and Insignia Systems Inc., from building comparable networks. They have been confined to the niche provision of in-store services such as floor advertising (the late Floorgraphics' Floortalk) or shelf signs with brand price messaging (Insignia's POPSign).

12.     Internally, News has acknowledged that it has sought to build contract barriers to these competitors to make it difficult for them to compete.

13.     The exclusionary effectiveness and durability of these News contracts designed to defeat competitors' distribution of competitive services have been reinforced by seven additional exclusionary News actions, including:

- Hacking into Floographics' computers to obtain customer lists and other marketing materials to solicit its accounts and lock them into News long-term and exclusive contracts;

- Staggering the terms of the exclusive contracts so that in any given year a News competitor would not have any substantial opportunity to expand its competitive retail distribution network;

- Enforcing aggressively contractual shelf exclusivity by removing competitors' services and telling customers that their promotions with competitors would not appear;

- Using large cash guarantees unjustified by potential in-store promotional revenues to derail competitor contracts with retailers, a practice expressly designed to exclude competitors from these chains;

- Disparaging and misrepresenting competitors' in-store advertising compliance rates, which are important to consumer packaged goods companies when they select a vendor;

- Disparaging competitors' financial capacity and ability to pay the retail chains for necessary access; and

- Defacing competitors' in-store advertisements and then disparaging the quality of the defaced promotions to the retail chains.

-3-

## 2. Exclusive Contracts Also Deny Competitors
### Access to Purchasers

14.     News has also employed long-term, exclusive (or right-of-first-refusal) contracts with consumer packaged goods companies to exclude its competition from substantial market opportunities as they sell to these companies.

15.     These long-term contracts often start with three- or four-year terms and then are routinely extended by News to make them exclusive for even longer periods.  Some contracts last a decade or more.  These are high and stout barriers that stand in the way of competitive bidding for News' business and that aid News in maintaining its in-store monopoly.

16.     Thus, News' competitors are suppressed at both ends of the chain of distribution. They are impaired pervasively as they seek access to customers, and their distribution is largely blocked  by News' exclusionary contracts with retail chains.

## B. News' Monopolization
### of the Sale of FSI Coupons

## 1. Long-term, Exclusive Contracts Denying
### Competitors Access to Purchasers

17.     FSI coupons are distributed on behalf of consumer packaged good competitors in newspapers nationwide by News and its competitors.  News has acquired and maintained market power over this relevant market and willfully monopolized this distinct relevant market.

18.     Insert coupons are a markedly different advertising medium from in-store services. The coupon medium is more conducive to conveying a sales story (unlike in-store shelf or floor promotions) and coupons create demand in all stores, not merely those stores targeted by particular

in-store promotions. Also, because coupons are redeemed, the effectiveness of coupon advertising in creating demand can be traced as well.

19.     To monopolize this relevant market News has made further use of long-term, exclusive (or right-of-first-refusal) contracts to impair its coupon competitors' access to purchasers in a distinct relevant market for the sale of FSI coupons in the United States. Here News has effectively bought contractual exclusivity for its FSI coupons by discounting pricing offered to consumer packaged goods companies.

20.     These long-term contracts, like those covering in-store promotion services, often have started with three- or four-year terms, terms then routinely extended by News to make them exclusive for multiple additional years.

## 2. Unlawful Tying or Bundling of FSI Coupons

21.     News also used its in-store monopoly to monopolize the FSI coupon market. It has offered consumer packaged goods companies large discounts in its monopoly in-store prices only if they purchased all their FSI coupons from News.

22.     This tying or bundling of the sale of products effectively suppressed competition from News' remaining competitor of any size, Valassis Communications, Inc. Since Valassis generally did not compete in the in-store relevant market, News' deep, in-store discounting forced Valassis into an anticompetitive Hobson's choice. It could sell to a customer by pricing its FSI coupons at below cost (by matching News' in-store discounts as well as any discounts offered by News on FSI coupons). Or it could lose the account altogether to News. Whatever choice Valassis made, it was suppressed and weakened as a competitor.

-5-

23. This Court prohibited such practices in an Order affirming the special master findings in the companion case *Valassis Communications., Inc. v. News America Inc.*, No. 2:06-CV-10240, 2011 W.L. 2420048 (E.D. Mich. 2011) (Tarnow, J.) (Docket No. 413) under the conditions set out therein.

### C. Injury to Competition

24. News' unlawful conduct has injured competition and enabled it to acquire and maintain market power in the two relevant markets for the sale of in-store promotion services and FSI coupons. News has used this market power to charge Plaintiff and other consumer packaged goods companies monopoly prices for these services and coupons throughout the damage period (which commenced in early 2008). These monopoly prices are substantially above the competitive pricing in both relevant markets that would have prevailed in the absence of News' unlawful conduct.

25. News' anticompetitive conduct occurring in the years before the commencement of the damage (or limitation) period governing this action (in early 2008) violates the antitrust laws, as well as conduct occurring thereafter. Plaintiff may recover for acts violating the antitrust laws before the commencement of the damage if such acts contribute to price injury accruing within the damage period.

26. Four News competitors in both relevant markets have already obtained hundreds of millions of dollars in lost profit as an antitrust remedy for News' violations of the sort alleged herein. Such recompense has been in the form of a judgment, or the settlement of litigation just before trial against News.

27.     On information and belief, the instant action is the first by a consumer packaged goods company seeking to obtain recompense for monopoly overcharging as a purchaser and not a competitor.  For more than 100 years the United States Supreme Court has repeatedly recognized that direct purchasers, such as Plaintiff, have a "preferred position" under antitrust law over other litigants precisely because their injury – paying higher prices – is the direct, foreseeable, and anticipated product of efforts to monopolize a market.

## II. PARTIES

28.     Plaintiff The Dial Corporation is a consumer packaged goods company organized under the laws of Delaware and headquartered in Scottsdale, Arizona. It sells personal care and household cleaning products in part under the Dial, Right Guard, and Purex trademarks.  It is a subsidiary of Henkel Consumer Goods, Inc.

29.     News Corporation is organized under the laws of Delaware and is the ultimate parent entity of subsidiaries selling in-store promotion services and FSI coupons in the United States.

30.     News America Inc. is a subsidiary of News Corporation which has the responsibility of managing the sale of in-store promotion services and FSI coupons through subsidiaries News America Marketing In-Store Services, LLC and News America Marketing FSI, LLC. All News entities are collectively referred to herein as "News."

## III. JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1337 (commerce and antitrust regulation) and 1331 (federal question), as this action arises under Sections One and Two of the Sherman Act, 15 U.S.C. §§ 1, 2, Section Three of the Clayton Act, 15 U.S.C. § 14, and

Sections Four and Sixteen of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, as well as the doctrine of pendent jurisdiction.

32.     Venue is proper because Defendants reside within this judicial district as provided in 28 U.S.C. § 1391(b) and (c), and as provided in Sections Four and Twelve of the Clayton Act (15 U.S.C. §§ 15 and 22).

## IV. RELEVANT MARKETS

### A. Relevant Product Market for Third-Party In-Store Promotion Services

33.     News sells and Plaintiff Dial purchases in a relevant product market for third-party promotion services ("in-store relevant product market"). News serves as a middleman between Plaintiff and other consumer packaged goods companies and retail chains.   These companies purchase from News in-store promotion services, which allow them to promote their products on shelves and elsewhere in chain stores.  News executes contracts with the retailers, which allow News to place the promotions in the retailers' stores.

34.     The in-store promotion programs include print and electronic signage, end-of-aisle displays, freezer displays, floor signage, and cart advertising, all designed to persuade shoppers to buy the product at the moment of decision.

35.     The  product  market  does  not  include  "trade  promotion"  arrangements  where individual consumer packaged goods companies have contracts with individual chains to promote their products. In part, this segment of in-store advertising is distinct from the relevant product market because such one-to-one relationships do not allow the consumer packaged goods companies to make pervasive and simultaneous national or regional promotional launches.  By contrast, the

contracts with News allow consumer packaged goods companies to place advertisements across as many as 40,000 stores and multiple retail chains.

36.      News offers shelf-mounted machines that dispense coupons or rebates (SmartSource Coupon Machines and SmartSource Shelf Take One), floor decal advertisements (FloorTalk), and shopping cart advertisements (SmartSource Carts). News also promotes two "at-shelf" signage programs: Shelftalk, which is an "at-shelf" sign with a brand message and Price Pop Guaranteed ("Price Pop"), which is an at-shelf sign with product prices. News is the only competitor with a complete array of these in-store promotion programs and well-developed national contracts with retailers. Thus, News is the only one-stop shop for a consumer packaged goods company to obtain access to a wide variety of in-store promotion services nationwide.

## B. Relevant Geographic Market for the Sale of In-Store Promotion Services

37.      Plaintiff and other consumer packaged goods companies can reasonably turn to purchase third-party in-store promotion services from competitors of News in an area encompassing the United States ("relevant in-store geographic market"). The relevant market (including the product and geographic markets as defined) is the relevant market for the sale of third-party in-store promotion services in the United States ("in-store relevant market").

## C. News' Market Power in the In-Store Relevant Market

38.      News has unlawfully acquired and maintained market power in the in-store relevant market.

39.      This market power is evidenced by either direct or circumstantial evidence.  As alleged herein News has demonstrated that, by virtue of its long-term, exclusive contracts and related

conduct, it has the manifest ability to exclude its competitors from substantial competitive opportunities.

40.     There is also significant circumstantial evidence of News' market power.  News has a large share of the market and has erected barriers to competitive entry and expansion in order to protect its monopoly.  By 2009 News had achieved $391,792,000 of in-store annual revenues in the United States, which amounted to 84 percent of the market. Its last remaining significant competitor, Insignia, had an approximate seven percent share.  Moreover, Insignia's business is concentrated in the brand, price messaging niche alone. (It provides the "POPSign" at-shelf advertising program, which incorporates both brand messaging and product price.) It does not compete in any substantial way with News' core coupon machine and shelf talk programs. News has been successful in containing it and not allowing it to achieve competitive "critical mass."

41.     Twelve remaining in-store competitors now share only approximately nine percent of the market among them.

42.     Until 2009 Floorgraphics was News' only other substantial in-store competitor. Floorgraphics primarily sold floor decals.  It effectively went out of business in early 2009 and its assets were bought by News as part of a settlement of Floorgraphics' monopolization action against News.

43.     Thus News now is the only significant company in the in-store relevant market with Insignia and other small competitors offering minor competition.

44.     This in-store monopoly is protected by multiple high and expensive barriers to entry and expansion facing competitors. First, for entry, a competitor must be able to offer a wide range of in-store services to match those of News. Second, as set out below, News' long-term, exclusive

-10-

contracts with retailers lock competitors out of approximately 85 percent of the retail distribution they need to compete nationally with News. Third, investments in promotional offerings and retail distribution must be made well before generating any revenues.

### D.  Relevant Product Market for Free-Standing-Insert Coupons Placed in Newspapers

45.    Plaintiff Dial has purchased FSI coupons in the form of coupon books from News for placement in newspapers across the country (typically on Sundays). Such coupons are sold in a separate relevant product market from the relevant product market for the sale of third-party in-store promotion services (and markets for other advertising).

46.    In part this is because insert coupons are a markedly different advertising medium. Their medium is more conducive to conveying a sales story (unlike in-store shelf or floor promotions) and they create demand in all stores, not merely those stores targeted by particular in-store promotions. Also, because coupons are redeemed, the effectiveness of coupon advertising in creating demand can be traced as well.  Further, coupons have the ability to target a particular type of buyer, who prepares in advance of shopping by selecting those items which he or she intends to purchase, and is thereby induced to seek out a particular item in the store based upon the coupon.

47.    Dr. Paul Farris, a professor at the Darden School of Business of the University of Virginia, puts it this way:

> Q.   In marketing either from the academic point of view or from the consumer product goods[] manufacturer's point of view, [is] the FSI business the same or [a] different business than the in-store promotion[] businesses?
>
> A.   They are quite different... the FSIs are great for new products, they are great to get a message across to a

-11-

broad audience. The in-store attention devices are
great to be sure that you remind people of that mess-
age or draw attention to the product just as they were
making the decision.

Trial Transcript (6/3/09) 22:14-25, *Valassis Communications, Inc. v. News America Marketing*

*Inc.,* No. 07-706645-CZ (Mich. Cir. Ct. Wayne County) (hereinafter "Valassis Tr.")

### E. Relevant Geographic Market for the
### Sale of FSI Coupons

48.     Plaintiff and other consumer packaged goods companies can reasonably turn to
purchase FSI coupons from competitors of News in an area encompassing the United States
("relevant FSI coupon geographic market"). The relevant market (including the product and
geographic markets as defined) is the relevant market for the sale of FSI coupons in the United States
("FSI coupon relevant market").

### F. News' Market Power in the FSI Coupon
### Relevant Market

49.     News has acquired and maintained market power in the FSI coupon relevant product
market. Direct evidence of its ability to control price and exclude competition is the pervasive
suppressive effects of its use of long-term exclusionary contracts with consumer packaged goods
companies as alleged herein. In addition, it has demonstrated the ability to exclude competition by
virtue of its capacity to extend its market power from the in-store relevant market into the FSI
coupon relevant market using exclusionary tying or bundling of the sale of FSI coupons with in-store
services.

50.     News' market power is also confirmed by circumstantial evidence. News unlawfully
maintains a market share in the relevant market of at least 80 percent or more.

-12-

51.     As with the in-store promotion market, the FSI coupon relevant market is characterized by high barriers to entry and expansion facing News' competitors, which make any News exclusionary conduct that much more likely to effectively exclude price and quality competition. First, it takes a competitor many years to build the relationships with the consumer packaged goods companies buying the coupons and the newspapers distributing them throughout the United States. Second, it takes years to develop the printing and distribution infrastructure and operations needed. Third, certain economies of scale are necessary to keep costs down and operate competitively with a competitor as large as News.

### V. NEWS' MONOPOLIZATION OF THE IN-STORE RELEVANT MARKET

#### A. Long-Term, Exclusive Contracts Denying Competitors Access to Distribution

52.     Consumer packaged goods companies buy in-store promotion services in grocery store and drugstore chains as a national sales tool. They seek to put their promotions in front of millions of consumers in more than forty thousand stores nationwide and News' competitors need to have extensive retail distribution networks comparable to those of News to be attractive alternatives. They have been unable to obtain such scope due to News' long-term, exclusive contracts with chains and thus have been denied substantial competitive opportunities.

53.     Internally, News has frankly acknowledged that it has sought to build contract barriers to make it difficult for competitors to compete. Valassis Tr. (6/25/09) 46:11-13.

54.     News obtained such an exclusive, national network of chains in order to control a large percentage of in-store promotions and to forestall competition. Valassis Tr. (6/17/09) 173:24-

174:12. News account manager Robert Emmel has testified that 100 percent of his retail accounts in the southeast United States had exclusivity clauses. *Id.*

55.     News has used Al Capone in *The Untouchables* as a role model forcefully extinguishing competition (with a baseball bat).[1]  In interviews Mr. Carlucci, Chief of News Operations, vowed to "destroy" his competitors as the executive "who has to have it all."[2]

56.     Eighty-five percent of News' in-store revenues come from its "core portfolio," including its SmartSource Coupon Machines and Selftalk brand messaging. Valassis Tr. 6/25/09 53:11-25. Its goal is to make sure that it has exclusivity for shelf messaging of any kind. Valassis Tr. (6/17/09) 176:5-177:14.

57.     The Company "used the over broad term shelf messaging in [its] contracts so that [it] could, in essence, deny anything that would go on the shelf as being a violation of the contract...." *Id.*

58.     News has aggressively obtained "letters of authorization" from the management of retail chains to show to store managers, which allow it to remove promotions of competitors. Valassis Tr. (6/17/09) 177: 15-25; (6/25/09) 48:15-49:7.

59.     Mr. Carlucci has emphasized repeatedly "we can't let [Insignia and Floorgraphics] get critical mass, can't let them get any bigger . . . we have to stop them where they are, not get into

---

[1]Peter Lattman, *Marketing with Muscle*, Forbes, Oct. 31, 2005, at 66 (Vol. 176, No. 9), *available at* 2005 WLNR 17625245.

[2]Joseph Rosenbloom, *High Noon in Aisle Five*, Inc.com, Jan. 1, 2004, at 88, *available at* http://www.inc.com/magazine/20040101/highnoon.html.

– most importantly . . . our core portfolio [coupon machines and shelf messaging]." Valassis Tr. (6/17/09) 172:17-173:4.

60.    In mid-2001, Mr. Carlucci came on a conference call with personnel managing in-store accounts and "expressed his extreme displeasure" with how poorly the News group managing the Floortalk floor advertising program (which was competitive with the Floorgraphics service), and the Price Pop program placing brand price messaging on the shelf (which was competitive with Insignia's service) was performing.   He gave "a call to action for the group to perform more effectively." Valassis Tr. (6/18/09) 43:3-44:12.

61.    He then announced new "aggressive tactics" by News against not only competitors but also retail chains to be comprised of "a plethora of new items that were going to be introduced into the marketplace." He stated that he did not want any retailers informed in advance of these new tactics. News was going to "assume" under retailer contracts that it had exclusive control of all the shelves in its retail chain accounts. As then Chief Operating Officer, he concluded that "if there was any one [on staff] who was a bed wetting liberal [and] concerned about doing the right thing, they should speak up at that point, and he would arrange for human resources to work with that person and they would exit the company." *Id.*

62.    As a consequence News' two significant competitors were not able to expand beyond the niche provision of in-store services such as floor advertising (the late Floorgraphics' Floortalk) or shelf signs with brand price messaging (Insignia's POPSign).

63.    Today, to obtain the necessary nationwide coverage, consumer packaged goods companies have to deal with one middleman, News, the only vendor with pervasive national access to retail chains by virtue of its exclusive contracts.

## B. Practices Enhancing Competitor
## Exclusion from Distribution

64.     News has enhanced the effectiveness and durability of its anticompetitive exclusive

contracts by seven additional exclusionary actions.

### 1. Hacking into Floographics' Computerized Customer
### Lists and Marketing Materials

65.     From 2000 to 2003 there was a concerted effort at News to develop its brand price

messaging product (Price Pop) to compete with the Insignia product (POPSign), as well as to

develop its Floortalk product competing with that of Floorgraphics.

66.     In the early part of 2003, News implemented "Operation Retailer Freedom" to take

away all Floorgraphics contracts by soliciting accounts on its customer lists. This program went on

for several years. Valassis Tr. (6/17/09) 176:2-177:14.

67.     Floorgraphics has alleged that News hacked into its password protected accounts at

least eleven times in 2003 and 2004 to obtain its customer lists (and other marketing materials),

which, if true, would facilitate this attack.

### 2. Staggering the Terms of Exclusive Contracts

68.     News has strengthened the exclusive effect of its contracts by staggering their terms

so that, in any one year, the opportunities for competitors to expand and underbid News' monopoly

pricing are limited. Its officers have acknowledged internally and frankly that this staggering has

increased the barrier to competition. Valassis Tr. (6/25/09) 46:16-48:1.

69.     The practice ensures that it will take a competitor many years to build up a network

comparable to that of News, and to offer meaningful price competition. *Id.*

### 3. Aggressive Enforcement of Shelf Exclusivity

70.    News has reinforced the contract barrier to competition by enforcing exclusivity clauses vigorously. It obtained from the management of retail chains letters of authorization which its personnel have shown to store managers in order to remove competitors' products. Valassis Tr. (6/25/09) 48:15-49:7.

71.    News has told the consumer packaged goods companies not to deal with its competitors because they "would be throwing money away" on promotions which would not appear.

### 4. Use of Cash Guarantees to Derail Competitor Contracts

72.    A "very important part" of News' decision to offer a cash guarantee to a retail chain (regardless of the amount of News revenues generated there) has been whether a competitor was already entrenched with the retailer and News wanted to displace it. Valassis Tr. (6/17/09) 151:6-15.

73.    In this regard, at "town meetings" in various sales offices around the country between 2000 and 2006, Mr. Carlucci emphasized that the company "was spending a considerable amount of money to prevent not only Floorgraphics' success in floors," but also to take away the opportunity for it to expand into the "core business of News," that is, coupon machines, shelf products, etc. He was seeking to protect News' "very profitable multi-portfolio business." Valassis Tr. (6/18/09) 45:7-46:15.

74.    For example, News paid a large guarantee in early 2002 to Eckerd Corporation, in part because an Insignia contract was being negotiated and News believed in "no way" could Insignia match the amount. Valassis Tr. (6/17/09) 154:13-156:11.

75.    Mr. Emmel saw no economic justification for the guarantee based on anticipated revenues from Eckerd placements. He believes it was paid to preclude Insignia, and as part of a larger corporate "blocking move," to damage Insignia. News wanted to prevent Insignia from getting "critical mass" in the drug sector, because RiteAid had already moved to Insignia. News paid $4.5 million over a three-year term to Eckerd. Valassis (6/17/09) 155:6-156:11. Eckerd later confided to Mr. Emmel that the guarantee was two or three times what it thought it could get. Valassis Tr. (6/17/09) 156:14-23.

76.    Mr. Emmel found the payment to Eckerd "outlandish" because it was a guarantee covering only the News brand price messaging program (Price Pop) (in competition with Insignia's POPSigns), and not News' core coupon machine and shelf programs, where its revenues were much greater. In his view, the guarantee was targeted only at Insignia's attempt to take over this account, not revenue generation. Valassis Tr. (6/17/09) 157:13-161:17.

77.    Similar unjustified guarantees, in Mr. Emmel's view, were given to Ahold when it was in negotiations with both Insignia and Floorgraphics in early 2003. Valassis Tr. (6/17/09) 168:22-169:10.

78.    Dominic Porco, a long-term News officer, told Mr. Emmel, that although the Ahold guarantees cost the company a "tremendous amount of money there was a great feeling of relief" because the cost to the company in lost profits would be far greater if either one of them became "a viable entity" and got "critical mass" to expand their portfolio and challenge News' coupon machine and shelf core businesses. Valassis Tr. (6/17/09) 169:24-171:8.  As Mr. Carlucci put it, "We've got to keep them . . . where they are." Valassis Tr. (6/17/09) 171:9-172:3.

### 5. Disparaging Competitors' Compliance Rates

79.    Of considerable importance to consumer packaged goods companies is the "compliance rate" of vendors of in-store promotions, that is, the percentage of the stores promised for an advertising campaign in which the campaign is actually placed.

80.    In a letter widely circulated to these companies in February 2003, Dominic Porco claimed News delivered compliance rates of 90 to 95 percent, and Floorgraphics' and Insignia's compliance rates were less than 50 percent and 20 percent, respectively. Valassis Tr. (6/17/09) 188:17-189:2, 189:16-24, 190:5-15. News continued thereafter to use these compliance figures in sales and marketing. *Id.* Mr. Emmel testified that none of these claims was correct. Valassis Tr. (6/17/09)189:12-15, 190:5-10.

81.    In his view, News was attempting to control in-store advertising in as many of the stores as possible and asserted low competitor compliance rates to frustrate their access to consumer packaged goods companies' business. Valassis Tr. (6/17/09) 192:4-193:4. Inside News it was considered a "brilliant strategy" to "attack the competitor." Valassis Tr. (6/17/09) 186:10-14, 187:4-11.

### 6. Defacing Competitor Advertisements and Disparaging Their Products

82.    Mr. Emmel recalls in 2003 that his supervisors instructed him whenever possible to take photos of ripped or torn Floorgraphics advertisements and bring them to the retailer's attention. He was also told to help the process along by tearing the Floorgraphics ads, and he was aware that other News employees vandalized competitor advertisements before taking photos for the retailers. Valassis Tr. (6/18/09) 62:9-63:14.

-19-

### 7. Disparaging Competitor Financial Viability

83.     News' account representatives were told to tell retailers that Floorgraphics was having difficulty meeting its contractual payments to retailers for promotional access. Valassis Tr. (6/18/09) 63:21-25, 64:13-25. Of course, Floorgraphics' access to these retail chains was essential to its survival.

84.     Also, Mr. Emmel disparaged Insignia's financial viability in his conversations with retail chains on a regular basis. Valassis Tr. (6/17/09) 183:2-16.

### C. Long-Term, Exclusive Contracts Also Denying Competitors Substantial Access to Consumer Packaged Goods Companies

85.     News has also employed long-term, exclusive and/or right-of-first-refusal contracts with consumer packaged goods companies to exclude its in-store and FSI coupon competitors from substantial competitive opportunities.

86.     These are multiple-year contracts often with initial three- or four-year terms. They are extended routinely in some cases by News to a decade or more (without intervening competitive bidding under a request for proposal process). The durability of these exclusive and/or right-of-first-refusal contracts effectively prevents competitors from providing vigorous price and quality competition for News in the provision of in-store promotion services.

87.     Thus News suppresses competitors with exclusionary contracts at both ends of the chain of distribution. Its competitors are contractually blocked from serving many purchasers and, when they do secure accounts, their distribution is crippled. This latter impairment in turn feeds back to further disadvantage their ability to sell to consumer packaged goods companies because News' distribution network cannot be matched.

-20-

## VI. MONOPOLIZATION OF FSI COUPONS

### A. Exclusive Contracts Also Denying Competitors
### Access to Purchasers

88.     In the relevant market for the sale of FSI coupons, News has once again pervasively used long-term exclusive or right-of-first-refusal contracts to impair its competitors' access to purchasers. A consumer packaged goods company is encouraged to give all its coupon business (or a set percentage) to News in exchange for discounted coupon prices. News thereby buys exclusivity.

89.     These long-term contracts, like those covering in-store promotion services, often start with three- or four-year terms which are routinely extended by News to make them effectively exclusive for multiple additional years. In some cases, these contracts have been exclusive for a decade or more, thereby building a wall around News' monopoly over FSI coupons.

### B. Unlawful Tying or Bundling of
### FSI Coupons

90.     Further, in conjunction with long-term, exclusive contracts, News has parlayed its monopoly and monopoly pricing in the in-store relevant market to monopolize the relevant market for FSI coupons.

91.     News pervasively offered large discounts on monopoly in-store pricing if the customer gave News all of its FSI coupon business. In effect, News was threatening punitive pricing for needed monopoly in-store services if a consumer packaged goods company did not give it all its FSI coupon business.

92.     Generally, Valassis has not sold in-store services. Thus, if Valassis discounted its FSI coupon pricing to match both News' in-store (and any additional FSI coupon) discounts, it would

be selling FSI coupons at a loss. If it did not do so, it would lose the business to News. In either case, Valassis was substantially weakened or suppressed as a competitor.

93.     This method of exclusion was a potent News exclusionary weapon because the companies had to walk away from large sums to take Valassis coupons. Valassis Tr. (6/25/09) 72:10-24, 89:23-90:17, 100:16-101:2,106:4-11,120:6-15,129:13-130:7.

94.     Consumer packaged goods companies using News' in-store promotion SmartSource coupon machines, without getting their coupons from News, paid a price as much as 64 percent higher for these machines than those who bought the News FSI coupons. Valassis Tr. (6/25/09) 89:7-11.

95.     If such a company used the News Shelf Talk product, but dealt with Valassis for FSI coupons, it had to pay to News from 24 to 67 percent more for Shelf Talk, depending on the year. Valassis Tr. 6/25/09 89:23-90:17.

96.     In multiple speeches by the head of News' FSI coupon business and its chief financial officer News expressed the "hope" that this strategy would "push" Valassis "to the brink of utter desperation" or "extinction." Valassis Tr. (7/9/09) 139:13-143:9.

97.     Thus, by offering pricing terms that effectively forced a company to take News' FSI coupons, News has used its in-store promotion dominance to erect a highly effective barrier to its FSI coupon competition. Since buyers need national in-store promotion services from News -- because essentially it is the only provider of such services -- they have a huge financial incentive to take News' FSI coupons to the exclusion of those of Valassis.

-22-

98.     Internally, officers of News admitted that they were leveraging News' dominance over the in-store promotion market by playing the "in-store card" in the FSI coupon market. Valassis Tr. (6/25/09) 95:17-96:3, 96:7-12.

99.     News told ConAgra that it charged consumer packaged goods companies that did not take News' FSI coupons 54 percent more than those that did.  Valassis Tr. (6/ 25/09) 120:6- 15.

## VII.  INJURY TO COMPETITION

100.     Because News has severely injured competition and achieved market power, it has been able to increase its in-store and FSI coupon pricing to the point where it has maximized its profits. Its pricing has been invariably higher than the price determined in a competitive market throughout the damage period applicable to this action, which commenced in early 2008.

101.     News' anticompetitive conduct occurring in the years before the commencement of the damage (or limitation) period in early 2008 violates the antitrust markets, as well as conduct occurring thereafter. Plaintiff may recover for acts violating the antitrust laws before the commencement of the damage period if such acts contribute to price injury accruing within the damage period.

102.     As a consequence, Plaintiff and other consumer packaged goods companies have suffered antitrust injury and damages. News continues to maintain monopoly pricing in both markets and its liability continues to accrue to purchasers for supra-competitive pricing (whether or not one or more of its exclusionary acts alleged herein has ceased).  Such pricing commenced approximately in 2004 for in-store promotion services (and well before the commencement in 2008 of the damage period in this action).  The unlawful pricing for FSI coupons for Plaintiff had commenced before the beginning of the damage period.

-23-

## COUNT I

### Monopolization

### (Section Two of the Sherman Act)

103.    All foregoing paragraphs are incorporated herein by reference.

104.    News has monopolized the relevant market for the sale of in-store promotion services in the United States in violation of Section Two of the Sherman Act, 15 U.S.C. § 2.

105.    It has willfully acquired or maintained market power in this relevant market. This market power is protected by high barriers to competitive entry and expansion.

106.    Its long-term, exclusive contracting and its other conduct enhancing competitive exclusion, taken as a whole, have unlawfully excluded or suppressed competition.

107.    News has injured competition and its suppression of competition has allowed it to charge Plaintiff and other consumer packaged goods companies unlawful monopoly pricing throughout the damage period beginning in early 2008.

## COUNT II

### Monopolization

### (Section Two of the Sherman Act)

108.    All foregoing paragraphs are incorporated herein by reference.

109.    News has monopolized the relevant market for the sale of FSI coupons in the United States in violation of Section Two of the Sherman Act, 15 U.S.C. § 2.

110.    News has willfully acquired or maintained market power in this relevant market. This market power is protected by high barriers to competitive entry and expansion.

-24-

111.   News' use of long-term, exclusive contracts and unlawful bundling, taken as a whole, have excluded or suppressed competition.

112.   News' bundling of in-store services and FSI coupons is unlawful because, after allocating all News' discounts and rebates applicable to products in the bundle to the price of its FSI coupons, News has sold its FSI coupons below their incremental cost. Incremental cost includes the sum of the following for each unit of output: (1) costs of goods sold in accounting usage; (2) marketing and/or distribution costs reasonably attributable to FSI coupons; (3) research and development costs reasonably attributable to FSI coupons if relevant; and (4) other costs shown to be directly avoidable if a unit of output of FSI coupons were not produced.

113.   With its exclusive contracts and bundling News has injured competition, and the exclusion of competition has allowed it to charge Plaintiff and other consumer packaged goods companies unlawful monopoly pricing throughout the damage period beginning in early 2008.

## COUNT III

### Exclusive Dealing

### (Sections One and Two of the Sherman Act and Section Three of the Clayton Act)

114.   All foregoing paragraphs are incorporated herein by reference.

115.   With its long-term exclusive contracts with retail chains and consumer packaged goods companies, News has unlawfully restrained trade, and acted in concert to monopolize, in violation of Sections One and Two of the Sherman Act, 15 U.S.C. §§ 1, 2 and Section Three of the Clayton Act, 15 U.S.C. § 14, in the relevant market for the sale of in-store promotion services and the relevant market for the sale of FSI coupons.

-25-

116.    News has willfully acquired or maintained market power in these relevant markets. This market power is protected by high barriers to competitive entry and expansion.

117.    The anticompetitive effects of these contracts far outweigh their procompetitive benefits, if any.

118.    News' contracts have denied News' competitors substantial competitive opportunities under Section Two of the Sherman Act and foreclosed at least 30-40% of each market under Section One of the Sherman Act and Section Three of the Clayton Act.

119.    News' exclusive contracts have injured competition and excluded competition. As a consequence, News has charged Plaintiff and other consumer packaged goods companies unlawful, supra-competitive pricing throughout the damage period beginning in early 2008.

## COUNT IV

### Tying

### (Section One of the Sherman Act)

120.    All foregoing paragraphs are incorporated herein by reference.

121.    In violation of Section One of the Sherman Act, 15 U.S.C. § 1, News has unlawfully tied products by either (a) expressly refusing to sell in-store promotion services except on the condition that a consumer packaged goods company also purchased all of its FSI coupons from News; or (b) pricing FSI coupons when purchased separately from in-store promotion services such that, in terms of price and quality considerations, the company has no economically practical option other than to participate in the tying arrangement.

122.    FSI coupons (the tied product) and in-store promotion services (the tying product) are sold in separate relevant markets and are different products or services.

-26-

123.    News has market power in the relevant market for the sale of in-store promotion services, the tying product. This market power is protected by high barriers to competitive entry and expansion.

124.    A substantial amount of United States interstate commerce is affected in the tied product, the sale of FSI coupons.

125.    News' unlawful tying is a *per se* violation of the antitrust laws or, in the alternative, is an unreasonable restraint of trade.

126.    News has injured competition and the exclusion of competition has allowed it to charge Plaintiff and other consumer packaged goods companies unlawful monopoly pricing for FSI coupons during the damage period beginning in early 2008.

## PENDENT CLAIMS

## COUNT V

## Monopolization

### (Section Three of the Michigan Antitrust Reform Act)

127.    All foregoing paragraphs are incorporated herein by reference.

128.    News has monopolized the relevant market for the sale of in-store promotion services in the United States in violation of Section Three of the Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. § 445.773.

129.    It has willfully acquired or maintained market power in this relevant market. This market power is protected by high barriers to competitive entry and expansion.

130.    Its long-term, exclusive contracting and its other conduct enhancing competitive exclusion, taken as a whole, have unlawfully excluded or suppressed competition.

-27-

131.   News has injured competition and its suppression of competition has allowed it to charge Plaintiff and other consumer packaged goods companies unlawful monopoly pricing throughout the damage period beginning in early 2008.

## COUNT VI

### Monopolization

#### (Section Three of the Michigan Antitrust Reform Act)

132.   All foregoing paragraphs are incorporated herein by reference.

133.   News has monopolized the relevant market for the sale of FSI coupons in the United States in violation of Section Three of the Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. § 445.773.

134.   News has willfully acquired or maintained market power in this relevant market. This market power is protected by high barriers to competitive entry and expansion.

135.   News' use of long-term, exclusive contracts and unlawful bundling, taken as a whole, have excluded or suppressed competition.

136.   News' bundling of in-store services and FSI coupons is unlawful because, after allocating all News' discounts and rebates applicable to products in the bundle to the price of its FSI coupons, News has sold its FSI coupons below their incremental cost. Incremental cost includes the sum of the following for each unit of output: (1) costs of goods sold in accounting usage; (2) marketing and/or distribution costs reasonably attributable to FSI coupons; (3) research and development costs reasonably attributable to FSI coupons if relevant; and (4) other costs shown to be directly avoidable if a unit of output of FSI coupons were not produced.

-28-

137.    With its exclusive contracts and bundling News has injured competition, and the exclusion of competition has allowed it to charge Plaintiff and other consumer packaged goods companies unlawful monopoly pricing throughout the damage period beginning in early 2008.

**COUNT VII**

**Exclusive Dealing**

**(Section Two of the Michigan Antitrust Reform Act)**

138.    All foregoing paragraphs are incorporated herein by reference.

139.    With its long-term exclusive contracts with retail chains and consumer packaged goods companies, News has unlawfully restrained trade, and acted in concert to monopolize, in violation of Sections Two and Three of the Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. §§ 445.772 and 445.773, in the relevant market for the sale of in-store promotion services and the relevant market for the sale of FSI coupons.

140.    News has willfully acquired or maintained market power in these relevant markets. This market power is protected by high barriers to competitive entry and expansion.

141.    The anticompetitive effects of these contracts far outweigh their procompetitive benefits, if any.

142.    News' contracts have denied News' competitors substantial competitive opportunities under Section Two of the Sherman Act and foreclosed at least 30-40% of each market.

143.    News' exclusive contracts have injured competition and excluded competition. As a consequence, News has charged Plaintiff and other consumer packaged goods companies unlawful, supra-competitive pricing throughout the damage period beginning in early 2008.

-29-

## COUNT VIII

### Tying

### (Section Two of the Michigan Antitrust Reform Act)

144.    All foregoing paragraphs are incorporated herein by reference.

145.    In violation of Section Two of the Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. § 445.772, News has unlawfully tied products by either (a) expressly refusing to sell in-store promotion services except on the condition that a consumer packaged goods company also purchased all of its FSI coupons from News; or (b) pricing FSI coupons when purchased separately from in-store promotion services such that, in terms of price and quality considerations, the company has no economically practical option other than to participate in the tying arrangement.

146.    FSI coupons (the tied product) and in-store promotion services (the tying product) are sold in separate relevant markets and are different products or services.

147.    News has market power in the relevant market for the sale of in-store promotion services, the tying product. This market power is protected by high barriers to competitive entry and expansion.

148.    A substantial amount of United States interstate commerce is affected in the tied product, the sale of FSI coupons.

149.    News' unlawful tying is a *per se* violation of the antitrust laws or, in the alternative, is an unreasonable restraint of trade.

150.    News has injured competition and the exclusion of competition has allowed it to charge Plaintiff and other consumer packaged goods companies unlawful monopoly pricing for FSI coupons during the damage period beginning in early 2008.

-30-

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that:

A.      This Court declare that News' conduct constitutes:

      (1)      Violations of Sections One and Two of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Section Three of the Clayton Act, 15 U.S.C. § 14; and

      (2)      Violations of Sections Two and Three of the Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. §§ 445.772 and 445.773.

B.      This Court permanently enjoin Defendants and their agents and employees from continuing their unlawful actions set forth herein;

C.      Plaintiff recover treble actual damages;

D.      Plaintiff recover their reasonable attorneys' fees and costs as allowed by law;

E.      Plaintiff recover pre-judgment and post-judgment interest at the highest rate allowed by law; and

F.      Plaintiff be granted such other and further relief as the Court deems just and equitable.

## **JURY DEMAND**

Plaintiff requests a trial by jury in this matter.

-31-

Dated: December 21, 2012

Respectfully submitted,

BY:  */s/ R. Stephen Berry*

BERRY LAW PLLC
R. Stephen Berry
1717 Pennsylvania Ave. NW
Suite 450
Washington, DC 20006
Telephone:  (202) 296-3020
Email: sberry@berrylawpllc.com
D.C. Bar No. 234815

KELLOGG, HUBER, HANSEN,
TODD, EVANS & FIGEL, PLLC
Justin M. Presant
1615 M St., N.W.
Suite 400
Washington, D.C. 20036
Telephone:  (202) 326-7900
Email: jpresant@khhte.com
Mich. Bar No. P74252

*Counsel to The Dial Corporation*

-32-